95 So.2d 670 (1957)
James D. BLANCHARD et al.
v.
ASHBY CONSTRUCTION CO., Inc., et al.
No. 4428.
Court of Appeal of Louisiana, First Circuit.
June 4, 1957.
Rehearing Denied June 28, 1957.
Writ of Certiorari Denied November 12, 1957.
*671 Guillory & Guillory, Eunice, for appellants.
Jacque B. Pucheu, Eunice, for appellees.
LOTTINGER, Judge.
This is a damage suit filed by James D. Blanchard and his insurer, Allstate Insurance Company, against the Ashby Construction Company, Inc. and its insurer, the Inland Empire Insurance Company. Damages are sought by the Allstate Insurance Company in the amount of $241.31, being the amount allegedly paid Mr. Blanchard for repairs to his automobile under the terms of its insurance policy. The latter seeks the amount of $100, being the amount allegedly paid by him under the deductible provisions of the policy and the further amount of $109,883.24 for personal injuries, pain, suffering and the like.
Judgment was rendered in the Court below in favor of both plaintiffs in the total amount of $341.31 for property damage, as prayed for, together with $3,500 to the plaintiff James D. Blanchard for pain and suffering, $170 for medical expenses and $35 for a back brace. From this judgment the defendant Ashby Construction Company, Inc. has appealed and the plaintiff James D. Blanchard has answered the appeal asking that the amount to him be increased to $12,805.
The accident occurred in the Parish of Jefferson Davis at about 5:00 o'clock p. m. on March 17, 1955 on U. S. Highway No. 190 at a point approximately midway between the towns of Elton and Basile. The weather was clear and the road straight and dry. Just prior to the accident, the plaintiff was driving his 1952 Chevrolet automobile in an easterly direction behind a truck belonging to the Ashby Construction Company, Inc. which was likewise being driven in an easterly direction by the said defendant's employee, one Tanzy Ardoin.
Mary Lee Wernley, divorced wife of the plaintiff, testifying in his behalf, stated that she was seated in the right front of the automobile which her husband was driving. She testified that her husband was from 150 to 200 feet from the truck ahead of him *672 when he pulled into his left lane and that he sounded his horn after he had gotten into the left lane. She stated further that as they started to go around the truck and just before they got to it, it pulled out in front of them. She stated that the right front side of the car was hit but that she did not remember what part of the back of the truck was hit.
On cross examination, this witness testified that just prior to the accident her husband was driving at about 55 miles per hour. They had come from Houston and were travelling in the direction of New Orleans. They had eaten lunch in Houston and the accident occurred at about 5:00 or 5:30 in the afternoon at which time her husband was proceeding at a rate of about 55 miles per hour. She testified that she did not believe that he increased his speed when he tried to go around the truck and stated further that she did not notice another car ahead of the truck. She stated also that she thought that the truck pulled to its left in an attempt to pass a car (which she did not see) and that she did not see the truck's turn indicator blinking before it turned left. She testified that she was awake at the time of the accident and was watching the road. She stated further that she did not tell him anything when the truck made its move to the left as it was too late and she could only reach out and put her hands on the dashboard. She approximated the distance when she first saw the truck as being about 2 blocks away and at about half a block away when her husband pulled to his left to go around it. They were about the length of a car from the truck when it began pulling to its left. She described the truck's movement to the left as a sudden one or "rather fast." She believed that the truck had gotten over into the left lane when her husband hit it. She stated that she was not sure whether or not it had crossed the center line and that she believed at the time of the collision that it was still going somewhat to the left. Their car was completely in the left lane at the time of the collision, although she thought it was at somewhat of an angle. She explained this further by saying that the front of their car was to the right and then went on to say that she thought they were going straight when they hit but that after the collision the front was somewhat to the right. She repeated that just before the collision, she thought that their car was going straight. Further, she thought that at the time of the collision the truck was also going straight. The road at the point of the collision was of concrete construction and straight for a fairly long distance in either direction. The accident occurred some 50 feet before they got to a bridge which had concrete posts on either side.
Eddie Brown, called as a witness on behalf of the plaintiff, testified that he was a body mechanic of some 20 years experience and owned his own body shop in Eunice, Louisiana. He stated further that he examined the car of the plaintiff which was damaged in the front end. He described the heavy part of the damage as being on the right front of the automobile and stated that his cost of repairing the car was $341.31 including wrecker service. The right front fender, he stated, had to be replaced, whereas the left front fender was repaired. Further damage was done to the right door which he stated was caused from the fender having been pushed back into the door. He also stated that the left hood half had to be repaired but that this did not mean that that part of the automobile had come into contact with the other vehicle. When asked what part of the car had struck the truck, the witness testified that "The best we could determine, which is pretty close, it seemed like the truck, for this car, would have gone under this truck and that the tire of that truck would have grabbed this bumper and just actually squeezed this car underneath the bed as she was flat from the top coming down." On cross examination the witness stated that it looked more like the car had been squeezed than had been hit, but that the blow was harder to the right side than to the left.
*673 The plaintiff testified that just prior to the accident he was travelling east on Highway 190 at a speed of 55 miles per hour going in the direction of Eunice. He stated that the collision occurred when he was in the left or passing lane and after he had been in that lane, for approximately 400 feet, at which time he was still travelling at about 55 miles per hour. He stated that he sounded his horn as he crossed over into the left lane and that he sounded it again about 50 to 100 feet before reaching the truck. He stated that the truck, instead of remaining in its right hand lane, pulled into the left lane when he was some twelve to 15 feet from it. He said the two rear wheels were past the center line and that his car was going straight at the time. The truck, he stated, was at a slight angle as it had not yet completely made its full turn into the left hand lane. He stated that no signals whatsoever were given by the truck driver prior to his pulling to the left and that his automobile struck the truck with its right fender headlight and bumper. He stated that he was able to put his foot on the brake pedal but did not have time enough to actually apply his brakes prior to the collision. Further, his car was dragged quite some distance estimated by him at a couple of hundred feet. He stated that after the accident he could not drive his car as the right front fender was mashed against the tire preventing him from steering. He described the locality of the accident as being a very straight road with which he was very familiar. He stated that there were no hazards and that it was a clear day.
Tanzy Ardoin, called as a witness on behalf of the defendants, testified that on the day of the accident he was proceeding east on the Basile-Elton Highway driving a truck for the Ashby Construction Company. Just before the accident, there was an automobile in front of him. He first saw it when it was about 150 feet away at which time it was going slower than he was. He stated that the plaintiff's car was about 400 or 500 feet behind him when he started to pass the car in the front at which time he had his signal lights on. He described his maneuver as pulling slowly to the left and after having looked in his mirror and seeing the plaintiff at about 400 or 500 feet behind him, he did not look again. The accident occurred after he had gotten completely in the left lane and was going straight ahead, at which time his right wheels had crossed the center line. When he first saw the plaintiff, he was in his right lane of traffic and had not gotten over to the left in any way. He stated further that the plaintiff did not blow his horn. He stated that the whole front end of the plaintiff's car hit the back of his truck rather than just the right front end. His truck was struck in the rear but more to the left.
On cross examination, the witness testified that he did not give a hand signal but did give a signal with his blinker lights of his intention to pull to the left. At the time of the accident, there were about ten men in the "dog house" in the rear of the truck and two in the cab, with him. He stated that the accident occurred when he had proceeded 100 or 150 feet after making his left turn.
On recross examination, the witness stated that he did not blow his horn before passing the Pontiac automobile which was in front of him and repeated that after having parked the truck, his blinkers were still on.
Overy Cormier, called as a witness on behalf of the defendants, testified as follows: Just before the accident, he was seated in the "dog house" in the rear of the Ashby truck. The benches in the "dog house" run along each side of same and the men sit facing each other. This witness, at the time, was seated on the right hand side, second from the rear. The Blanchard automobile was about 400 feet to the rear when the truck started pulling to the left and when the collision occurred, the truck was all the way over into the left lane of traffic. He described the position *674 of the truck as being "almost straight." The collision was a little more to the left of the truck than center, the witness stated. He said that he did not hear the plaintiff blow his horn before striking the truck and that he had watched the plaintiff's car from the time he first saw it until it actually hit the truck.
On cross examination the witness testified that he did not remember how many men were in the back of the truck with him, nor did he remember who was sitting closest to the door of the "dog house." He first saw the plaintiff when he was some 600 feet away. He did not know why the truck pulled to the left nor did he know that a car was in front of it. He did not notice after the accident whether the blinker light was working or not. He did not hear the horn of either the truck or the automobile.
On redirect examination, he repeated that he first saw the Blanchard automobile some 500 or 600 feet behind the truck and stated that both vehicles started into the left lane at about the same time. His testimony at this point was as follows:
"Q. Who started into the left lane first?Your truck or Mr. Blanchard? A. We started about the same. We were a little bit ahead of him but he kept coming and we were about the same and he kept following and when he got to us he didn't have any more space to go around.
"Q. Now, let's make it clearI'll ask you again. Did Mr. Blanchard get into the left lane or start into the left lane ahead of the truck? A. No, the way it is, we started to go a little ahead of him."
Eszey Thibodaux, called as a witness on behalf of the defendants, testified that he was on the left side of the truck in the dog house, seated next to the back door thereof just before the accident. He said that he first saw the plaintiff's car when it was about a quarter of a mile to the rear and in its right hand lane of traffic. He saw it move over into the left lane when it was some 60 yards to the rear and it moved to the left before the truck did. When the accident occurred, the wheels on the driver's side of the truck had crossed the center line and the wheels on the right hand side of the truck were "astraddle" of the center line. At the time of the collision, the truck was pretty straight and the accident occurred as the right hand fender struck the left hand side of the truck. He stated that he did not hear the plaintiff blow his horn before the accident. He did not notice any signal lights blinking after the accident.
John P. Lejeune, testifying on behalf of the defendants, testified that he also was riding in the "dog house" and was on the left or driver's side just before the accident. He did not see the car until it hit the truck, and said that at the time of the accident he didn't believe that the rear wheels of the truck were quite across the center line. After the accident, when he got out of the truck, there was a signal light on the left hand side blinking. On cross examination, the witness stated that he did not know whether the blinking lights were on when the truck started to turn to the left. He stated on redirect examination that he did not hear the plaintiff blow his horn.
The above and foregoing shows that there is utter and hopeless conflict in the testimony of the witnesses for the respective sides. The trial judge made the following factual findings:
"The primary question in my mind was whether or not the plaintiff was not also negligent.
"This question of fact is resolved in favor of the plaintiff. I do not believe that plaintiff was approaching at a high rate of speed because of the light impact and because of the relatively short distance that both vehicles travelled following the collision.

*675 "From the physical facts stressed in the first part of this opinion I am of the opinion that plaintiff's right front bumper and fender struck defendant's left rear dual wheels at a point only three or four feet north of the center line of Highway 190. I am also of the opinion that defendant's vehicle did commence its turn into the passing lane at a time when, without question plaintiff had preempted the passing lane, but also at a time when plaintiff could take no possible evasive action to avoid the collision. If defendant turned on his turn indicators, I am of the opinion that they were turned on at a time when they could serve no useful purpose in warning the plaintiff. The fact that Ardoin felt that he had ample time to pass a vehicle before plaintiff overtook him shows that he was not concerned with signaling his intentions."
It is the well settled law and jurisprudence of our state that a person who attempts to make a left turn or who attempts to turn from a direct line on the public highways of the state must ascertain before turning that the turn can be made safely. LSA-R.S. 32:235, subd. A, and R.S. 32:236, subd. A. Considering all the facts and the law on the matter, we are of the opinion that the negligence of the defendant was the proximate cause of the accident.
With respect to quantum the trial judge concluded as follows:
"As to the quantum of damages plaintiff has sustained his burden of proving Three Hundred and Forty One and 31/100 Dollars ($341.31) damages to his vehicle. Two hundred and Forty One and 31/100 Dollars ($241.31) is awarded to Allstate and One Hundred and No/100 Dollars ($100.00) to the plaintiff. As to the personal injuries the facts are that immediately following the accident plaintiff did not realize he was seriously injured. Within a few hours his back caused him a great deal of pain. He was seen by Dr. McBride of Iota, Louisiana and given sedatives. On March 23, 1955, plaintiff visited Dr. Frank O. McGehee, orthopedic surgeon of Houston, Texas. Dr. McGehee diagnosed fractures of the 1st and 2nd transverse processes of lumbar vertebrae on the plaintiff's left side. Physiotherapy and sedatives were prescribed. Plaintiff was also seen by Dr. McGehee on April 12th and April 18th. On each of these visits plaintiff was having pain but Dr. McGehee was of the opinion that the fracture of the transverse processes were all that was involved and that this would cause no permanent disability. Plaintiff was next seen on May 20th and reported symptoms which caused Dr. McGehee to think of the possibility of a nerve root irritation or a ruptured disk at the level of the 5th lumbar vertebra. On that date plaintiff was sent to Dr. Marshall Henry a neuro-surgeon of Houston, Texas. There is no testimony in the record nor are there any reports showing Dr. Henry's findings. Plaintiff was next seen on June 1st at which time Dr. McGehee prescribed a back brace. On June 13th Dr. McGehee checked the fit of the back brace and noted in his records that plaintiff stated that he was much improved.
"In addition to plaintiff's reporting to Dr. McGehee for the above listed examinations, plaintiff visited Dr. McGehee's office for the prescribed diathermy treatments on the following dates: March 25, 1955; March 28, 1955; March 30, 1955; April 12, 1955; April 14, 1955; April 18, 1955; April 25, 1955; May 20, 1955; May 25, 1955; June 13, 1955.
"Plaintiff's next visit to Dr. McGehee was on November 7th and on that occasion plaintiff gave a history of having sustained another automobile accident on October 11, 1955, wherein *676 he had reinjured his back. Plaintiff then saw Dr. McGehee on the following dates: November 28, 1955; December 5, 1955; February 7, 1956; February 28, 1956; March 12, 1956; March 30, 1956.
"On March 6, 1956, plaintiff had a myelogram performed on the cervical region of his back and received a negative report.
"Dr. McGehee states that he is of the opinion that the pain plaintiff was experiencing in his low back region could be referable to the first accident. He does not know that plaintiff has a ruptured intervertebral disk, but neither has he ruled out the possibility. He felt that it would be desirable to have a myelogram performed which would show the condition of the lumbar vertebra of plaintiff's back, but as of the date of the trial, it had not been performed.
"Dr. C. V. Hatchette examined plaintiff on behalf of the defendant on April 26, 1956. He noted in his records that plaintiff stated that he had fully recovered from the first accident when the second accident occurred. Dr. Hatchette was unable to find evidence of a ruptured intervertebral disk. He did not believe that a lumbar myelogram was indicated. He did find symptoms referable to the right low back region which he felt would be fully recovered in three months. He felt that the plaintiff was exaggerating his complaints.
"At the time of the accident plaintiff was employed as a salesman for Elliott Metal's Inc. His job required that he drive several thousand miles per month; that he engage in various sporting activities to entertain his prospective clients. He specifically named golf, bowling and horse back riding as activities which he could perform before the accident but could no longer perform.
"At page 44 of the transcript plaintiff testified that as a result of the first accident he stayed in bed approximately three days but that he never did quit work.
"Plaintiff bears the burden of proving the extent of his injury and it cannot be said that he has proved that he has a ruptured intervertebral disk. Indeed, the fact that he missed so little work, and the fact that he did not visit the doctor from June of 1955 until sometime after the second accident several months later is very significant to this Court in determining the extent of plaintiff's injury from the accident which is the subject of this suit.
"For the injury above described, together with the physical pain and suffering and mental pain and anguish this Court is of the opinion that plaintiff should receive damages in the sum of Three Thousand and Five Hundred and No/100 Dollars ($3,500.00). The medical expenses incurred with Dr. McGehee in connection with the first accident totaled One Hundred and Seventy and No/100 ($170.00) Dollars. The back brace fitted in June of 1955 cost Thirty-five Dollars ($35.00) and all of these above listed sums are allowed as damages. The evidence did not sustain the award of damages for plaintiff's other claims."
The issue presented is purely factual and we cannot conclude, from the record as made up, that the trial judge committed manifest error in either his conclusions with respect to liability or with respect to quantum.
For the reasons assigned, the judgment appealed from is affirmed.
Judgment affirmed.